And our number 6 case today is Donley v. Stryker. Ms. Sadie. Good morning, Your Honors. May it please the Court. I'm Kate Sadie and I represent the plaintiff appellant in this case, Kelly Donley. We're here today on the question of how much evidence is enough evidence to support the requisite causal link in a retaliation claim and to allow my client to present her case to a jury. In Ortiz v. Warner, this Court recently clarified that in answering that question, you have to put all of the evidence in a single pile and evaluate it as a whole. But the District Court ignored that instruction in this case in considering Stryker's motion for summary judgment, improperly parsed Donley's evidence, drew inferences in favor of Stryker's motion, and ignored material issues of fact. Today we ask the Court to reverse the lower court's decision and deny summary judgment because when the following three pieces of evidence are placed in that single pile and considered as a whole, Donley has presented enough evidence for a jury to infer the requisite causal link. First, the suspicious timing between Donley's protected activity and Stryker's adverse action supports the requisite causal link. Second, Stryker's pretextual justifications for Donley's termination amounts to evidence of a causal link. And third, Stryker's more favorable treatment of a similarly situated employee supports a finding of the requisite causal link. Moving to my first point, the timing of Ms. Donley's termination is sufficiently suspicious to give rise to an inference of retaliation. In June of 2014, Donley learned that a regional sales director had sexually harassed a young female subordinate. Her coworkers had witnessed the harassment but didn't want to come forward themselves out of fear of retaliation. So on June 24, 2014, Donley made an internal complaint of harassment. Just six weeks... The investigation began the day after her complaint was resolved, right? The manager retired or resigned on effective July 31, and the exit interview with the other employee was August 1, according to Ms. Freshweiler? Yes, Your Honor, Ms. Freshweiler. Okay. Let me just cut to the chase here, if I could. I'm trying to see your best case under summary judgment. And under that best case, as I see it, Mr. Thompson, her supervisor, plaintiff's supervisor, sees the photos and video that were taken of this person in May. He's not happy about it, but he says simply that plaintiffs should delete them. Yes, Your Honor. And takes no further action. The plaintiff engages in the protected conduct in June, and then the day after her complaint is resolved, the defendant starts investigating her. And a couple of weeks later, she's fired in a joint decision made by Thompson and Freshweiler. Is that right? Yes, Your Honor. So we don't have direct evidence that Thompson knew of the protected activity, do we? No, Your Honor, we do not. We know that Freshweiler knew about it. And so why is it reasonable or not speculative to infer that Thompson learned of the protected conduct before joining in this decision to fire her? Your Honor, it would be speculative to infer that, but plaintiff doesn't need to prove that Thompson had knowledge of the protected activity to defeat summary judgment in this case. The evidence shows that Freshweiler had knowledge of Donnelly's alleged misconduct, that she had taken these alleged photographs and videos prior to engaging in her protected activity by reporting sexual harassment. Yet Freshweiler chose not to do anything about it until after she engaged in protected activity. So my attempt to state your best case was not correct. So what's the evidence that Freshweiler knew before the protected conduct? Jeff Thompson testified that he learned of the photographs from a subordinate in Chicago, at the office after they returned from bail, and that he immediately reported that knowledge, that information, to Ms. Freshweiler and asked that she investigate. Now, Mr. Thompson admittedly does not remember specifically when he asked Ms. Freshweiler to investigate. What he does remember, though, is that that call was separate and distinct from the investigatory interview that he had with Ms. Freshweiler after that August 1st exit interview. So there is enough evidence in the record for a jury to at least infer that Ms. Freshweiler had knowledge of the photographs at issue prior to engaging in protected activity. Which brings me to my second point, which is that the evidence in the record supports an inference pretext. The evidence in the record supports that both Thompson and Freshweiler had knowledge of Donnelly's alleged misconduct before she engaged in protected activity, but that they failed to investigate or take any disciplinary action.  Donnelly testified she showed him the photographs, and Stryker admitted as much in its position statement. And with regard to Freshweiler, the record is admittedly less clear, but there is enough there that a jury could understand or could infer that she had that knowledge. Now, the lower court discounted that inconsistency as immaterial. They ruled that because Donnelly had not presented any evidence that Freshweiler harbored any retaliatory animus toward Donnelly, that issue of fact was immaterial. But, of course, that reasoning is circular. If Donnelly can present evidence of pretext, that is in and of itself evidence from which a jury could infer retaliatory animus. When Stryker learned of Donnelly's alleged misconduct is arguably the most important question of fact in the case, and where Stryker's testimony on this point is inconsistent, a reasonable jury could hold that Stryker knew about the pictures before Donnelly engaged in protected activity, but failed to do anything about it until after. Now, Donnelly can also point to the suspicious timing that we were talking about earlier, which is that she made her complaint of sexual harassment four weeks later she was investigated and six weeks later she was terminated for conduct she'd engaged in three months prior. The district court examining that evidence ruled that the timing was insufficient and immaterial, where it alone would not have led to a finding of retaliatory animus. But, of course, Donnelly didn't present that evidence in a vacuum. She presented that evidence along with the evidence of pretext in addition to the evidence that the company had treated similarly situated individuals more favorably. And as this court has ruled in Coleman v. Donahue in 2009, where timing evidence is presented in addition to other circumstantial evidence of retaliatory intent. The problem, counsel, is that the pretext evidence that you're relying on is not borne out by the record and the proffered comparison employee, the sales manager who was accused of harassment, is not materially similar to your client. Your Honor, I can respond. He was fired. They both got fired. They both got fired. You're right, Your Honor. Both did get fired. However, at the time of the allegedly disciplinary termination of the actual sexual harasser who my client reported, he was offered and given $30,000 in severance compensation. Now, the company would have us believe that he was given the severance compensation to strengthen a non-compete that he had signed in 2006. However, there was nothing in the severance agreement that actually strengthened the language of the non-compete. And the record is clear that the company doesn't dispute that both my client and the sexual harasser had access to confidential, large amounts of confidential and proprietary information. So there's enough evidence in the record from which a jury could infer that Domley posed the same competitive risk as the regional sales director, which would make the fact that he was issued this $30,000 severance payment. Right, but we've got different positions, different ranks in the company, different decision makers. Your Honor, I would argue. Different misconduct. There just isn't a remote similarity here. Respectfully, Your Honor. Other than they both got fired. I would disagree. Number one, we have the same decision makers. Stacey Fershweiler, the HR individual who investigated my client, was involved in both investigations of Domley and the regional sales director. She was also involved in both decisions to terminate. The record is clear on that. And with regard to titles and responsibilities and those sorts of factors, this court stated in Humphreys v. Seabox that all we need to point to is enough meaningful comparison or enough similar factors to present a meaningful comparison. Here we have two individuals who both allegedly violated the same code of conduct, who both were investigated by the same HR person, and who were both terminated as a result of their investigations. Those factors in and of themselves. That will virtually always, I mean, you're going to have those factors all the time, right? Yes, Your Honor. HR, and if any violation of the whole code of conduct is treated as comparable or close enough for a jury question, you're always going to have a comparator. Well, I would argue that you don't always have the same HR person. In this company, for instance, there are at least more than one HR officer involved in the investigations, and it's a large company. I would argue that there are likely far more than two. And in this case, the policies for the company are broken down such that the code of conduct is corporate policy number one. There are something like 15 or 20 corporate policies. So you're not always going to have an instance in every termination where the individuals have fallen victim or fallen prey of the same policy just because they engaged in some misconduct. I see my time has concluded, Your Honors. I would ask respectfully that this Court reverse the decision of the Court below and deny summary judgment. Ms. Billows. Good morning, Your Honors. I am here on behalf of Stryker Corporation. The District Court properly evaluated the totality of the evidence under this Court's standard in Ortiz and properly concluded that no reasonable jury could find a causal link between Ms. Donnelly's internal complaint and her termination of employment. On August 1, 2014, a voluntarily departing employee had an exit interview with Stacy Fershweiler, the Director of Human Resources. Could you address Mr. Thompson's account in which he had told Ms. Fershweiler in HR about this earlier? Mr. Thompson's account is not that he told Ms. Fershweiler about this in May or June, but that he remembered having multiple conversations with her around the investigation, including before his interview with Ms. Fershweiler about this issue. As Ms. Sade concedes, the record is not clear that Mr. Thompson stated that he had any such conversation with Ms. Donnelly with Ms. Fershweiler in May, June, or July. Furthermore, both Ms. Donnelly and Mr. Thompson concur on this point. At no point did she show him, as she testified, a compromising photo, which Stryker says is the photo of Ms. Donnelly. So help me with the EEOC statement. Plaintiff complainant also showed the photos and video to Jeff Thompson, the Director of Clinical Sales and Complainants Manager. Mr. Thompson, like Ms. Schexnayder and Ms. Wise, was unamused and advised complainant that she should delete the photos and the videos. Where did that come from? Your Honor, unfortunately, we do not know where that came from. Mr. Thompson testified. You agree it's an admission of the defendant? We admit, Your Honor, that there is precedent that says position statements can be admissions here, where it's used for justifying reasons inconsistently. But there's been a consistent justification here. This is just a factual assertion by the defendant. And, Your Honor, Ms. Donnelly herself contradicts that. Ms. Donnelly says that did not happen. Mr. Thompson says that did not happen. She gets to pick and choose on summary judgment. And, I mean, did counsel for the company make it up? What was the factual basis for it? Your Honor, there is no indication in the record what the factual basis was, because both Mr. Thompson, who did not review the position statement, and Ms. Donnelly testified that they did not have that conversation. And so, Your Honor, it should not be deemed an admission against striker with respect to reason. Why not? Because Mr. Thompson himself, number one, Your Honor, did not review the position statement. So what? I mean, is that a requirement for admissibility? No, Your Honor, but in looking at the totality of the facts here and the fact that Ms. Donnelly and Mr. Thompson both concede that that is not what transpired. Additionally, the fact that Mr. Thompson had no knowledge of any protected activity, retaliatory animus cannot be imputed to him. Mr. Thompson clearly testified he did not know that Ms. Donnelly had complained of any alleged sexual harassment. But we know that Ms. Fershweiler did, right? We know that Ms. Fershweiler did as part of her— And we know that the decision to fire Donnelly was made with the two of them, right? Mr. Thompson clearly stated that he was a decision maker, but that, yes, he did so in consultation, which is not uncommon in organizations, Your Honor, with human resources. This is correct. But it is abundantly clear from both Ms. Fershweiler and Mr. Thompson that they never at any point discussed the fact that Ms. Donnelly engaged in protected conduct or activity. Or Mr. Thompson even said he didn't even know why the regional sales manager had been terminated or let go. He didn't even know the facts and circumstances surrounding that. The premise here for summary judgment, though, is given the various conflicts in the testimony of different people for Stryker, it's not unreasonable to infer that memories are faulty and or somebody is being dishonest about this. But critical details. It is summary judgment, right? Agreed, Your Honor. But if you look at the undisputed facts in their totality, as Judge Koukouris did, the only reasonable conclusion here is that summary judgment was proper. Ms. Donnelly admits to engaging in the misconduct. She took a picture of a highly valued partner of Stryker in her pajamas in her hotel room after Ms. Donnelly escorted that woman to her room because she was concerned about her. That CEO vendor partner says, no more pictures, please. And she takes another picture of the vendor. We get this, I think. But if the EEOC statement is admissible, then we've got Thompson aware of the misconduct and taking no further action other than just knock it off, delete the photos. And three months later, after the protected conduct, changing his mind and saying, this is terrible, we've got to fire you. What accounts for the change of mind? Your Honor, respectfully, we contend that there is no change in mind. But to your point, let's assume you're right. Assume it's part of the record. Plaintiff is entitled to rely upon it. Your Honor, when Ashley Schechtsnyder resigned on August 1st, that is what set into motion the investigation of the alleged photos taken by Ms. Donnelly. She voluntarily resigned. It's standard operating procedure for human resources to me. Sure. What changed Thompson's mind? What did he learn from that investigation that, according to the EEOC statement, he didn't already know? Mr. Thompson, in the position statement, it doesn't describe what photos Mr. Thompson allegedly sought. Admittedly, photos were taken that evening that were of both. The photos and video. That's the statement. And it does inscribe which photos were at issue. Your Honor, there are multiple photos that are at issue in this case. The one that Stryker ultimately determined to be the most abhorrent is one where Ms. Donnelly concedes that perhaps the CEO-valued vendor had blinked and closed her eyes so it looked like she was passed out in her bed with the trash can next to her. Mr. Thompson does never testify that he saw that that evening, and certainly that's not referenced in the position statement. Yes, he acknowledges that the position statement references photos, but there were also testimony from him that Ms. Donnelly had been taking photos all evening, and Ms. Donnelly herself admits that she passed the phone around for coworkers to see the photos on her phone. Whatever it was, it was offensive enough for him to say to delete them. I understand that that's what the position statement says, Your Honor. That's what the position statement says, yes. I understand you want to walk away from it, but I don't see how you get to do that on summary judgment. And, Your Honor, respectfully, even if I don't get to walk away from that, the fact that Stacey Fershweiler first learns of these offensive photos on August 1st and conducts her investigation and ultimately looks at the conduct that is engaged in and is corroborated by multiple employees, and employees have come forward and said to Ms. Fershweiler, this is inappropriate, and we find it to be highly inappropriate. And that's what causes her to conduct the investigation. Ultimately, Your Honor, that breaks any causal link whatsoever between the timing of her protected conduct and ultimately her termination. The problem you have with that is that Fershweiler does know about the protected conduct, and Thompson, given the EEOC statement, changes his mind. Your Honor, Fershweiler did know about the protected conduct, this is true, but HR, as Your Honors have noted, typically are involved in these situations, are going to be involved and know that... Of course, and the question here is not ultimate merits, but whether there's a trial. Agreed, Your Honor. And you've got a lot of contradictory evidence and different inferences that can be drawn. Your Honor, respectfully, I would disagree from the admitted misconduct by Ms. Donnelly, the timing of the events, the separate intervening event of an employee resigning and bringing forth this conduct to human resources, warranting the investigation, ultimately then with respect to taking the appropriate action viewed as being inappropriate and poor judgment. Did Thompson have anything to do with the initiation of the investigation against the plaintiff? He did not, Your Honor. Ms. Fershweiler made that determination based on the exit interview of the employee. And what do we do with this somewhat confusing testimony about whether Thompson spoke with Fershweiler separately? Thompson admits that as part of the investigation and surrounding the investigation, they had conversations because Mr. Thompson, this employee, was on his team and resigned as well, and so he was made aware of all the facts and circumstances. I think where Ms. Donnelly's counsel is parsing out is his investigatory interview with Ms. Fershweiler related to the incident, Your Honor, and what he knew about the photos or did not, versus him having conversations with HR to understand that one of his employees is being investigated. And I think the record is clear that there were multiple conversations, but only one investigatory interview that he participated in. Stryker Corporation respectfully requests that this court affirm the district court's grant of summary judgment. Thank you. Thank you. Anything further? Just briefly, Your Honor. I just want to reiterate the point that Fershweiler learning of the photographs at issue does not break the causal link. This is not an intervening event case, as Stryker would have the court believe. The record is replete with inconsistencies and evidence that would support the inference that the company, both Jeff Thompson and Stacey Fershweiler, knew of the alleged misconduct prior to Donnelly's engagement in protected activity and yet chose to do nothing about it until after she reported it. What's the clearest signal that Fershweiler knew about this before August 1st? The clearest signal is Jeff Thompson's testimony, that he learned of the photographs allegedly from a subordinate after they got back to their office from bail and that he notified Ms. Fershweiler of the photographs and asked her to investigate. It would make no sense for Mr. Thompson to have asked Ms. Fershweiler to investigate those photographs if he had already been interviewed as part of an investigation into Donnelly's conduct. For those reasons, we request that the court reverse the decision and deny Stryker's motion for summary judgment. Thank you. Thanks to both counsel. The case is taken under advisement.